In re CHIPIN CLIVEDEN ASSOCIATES, INC. CW Properties, Inc., and Ansaldo Associates, Inc. as Co-Partners, t/a Cliveden Development Associates (A Partnership), Debtor.

WILLIAM PENN SAVINGS AND LOAN ASSOCIATION, Plaintiff,

v.

CHIPIN CLIVEDEN ASSOCIATES, INC. CW Properties, Inc. and Ansaldo Associates, Inc., as Co-Partners t/a Cliveden Development Associates (A Partnership) and The Fidelity Bank and Silvi Concrete Products, Inc., and Glenn Noret and Jack Cardonick & Sidney Feinstein and Redi Concrete Company, Inc. and Charles Anastasi, Joseph Anastasi, Herbert Fogel, and Waterman Electronic Tube Company, as Co-Partners, Trading as Commercial Investor Associates (a Partnership), Intervenors/Defendants.

Bankruptcy No. 81–02292G.
Adv. No. 82–1294G.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 23, 1984.

Gilbert J. Golding, Curtin & Heefner, Morrisville, Pa., for plaintiff, William Penn Savings and Loan Ass'n.

Robert Kargen, James M. Matour, White & Williams, Philadelphia, Pa., for debtor/defendant, Chipin Cliveden Associates, Inc. CW Properties, Inc. and Ansaldo Associates, Inc. as Co-Partners, t/a Cliveden Development Associates (a partnership).

John F. Horstmann, III, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant, The Fidelity Bank.

W. Paul Veit, Schneider, Nixon & John, Hatboro, Pa., for defendant, Glen Noret.

Lawrence R. Lesser, Lesser & Kaplan, Blue Bell, Pa., for intervenors/defendants, Charles Anastasi, Joseph Anastasi, Herbert Fogel and Waterman Electronic Tube Co.

as co-partners trading as Commercial Investor Associates.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue in the case at bench is the construction to be given a provision in a loan contract between a debtor and a first mortgagee of the debtor's realty which grants a partial release of the mortgage in a subdivision of realty when each constituent lot is sold. This contract must be resolved in light of a subsequent agreement among a second mortgagee, the first mortgagee and the debtor, whereby the second mortgagee lent the debtor additional funds in reliance on the partial release provision. The issue arises under the complaint[1] of William Penn Savings and Loan Association ("Penn") requesting a determination of lien priority and a distribution of the proceeds of the sales of the lots which are currently held in escrow.

The facts of this case are as follows:[2] Under a construction loan contract ("the Penn Agreement") Penn agreed to lend Ansaldo Associates, Inc. ("Ansaldo"), $1,155,-000.00 to finance the construction of a residential development in Bucks County, Pennsylvania. In exchange, Ansaldo granted Penn a mortgage which was filed on July 6, 1978 on the realty underlying the intended project. Section 6D of the loan agreement provided, in part, that Penn would "release from the lien of the mortgage any individual lots in [the property] upon payment of the sum of $60,800.00". Section 7 provided, in part, that "[t]he parties do not intend the benefits of this Agreement to inure to any third party except as provided in Section 14[3] hereof."

---

1. Silvi Concrete Products, Inc. Redi Concrete Company, Inc., as well as Jack Cardonick and Sidney Feinstein have not responded to the plaintiff's complaint and they will not be discussed further.

2. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 (effective August 1, 1983).

3. This provision originally referred to "Section 15" but the parties have stipulated that this was a typographical error. Section 14 provides as follows:

    14. This Agreement shall be binding upon the parties hereto and upon their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the successors and assigns of the Association; provided, the Owner shall not voluntar-

The agreement apparently provided for the compounding of interest on the principal debt after default.

In order to gain further financing for the project, Ansaldo and two other entities, CW Properties, Inc. ("CW"), and Chipin Cliveden Associates, Inc. ("Chipin"), formed the debtor partnership, Cliveden Development Associates. The realty in question was then transferred by Ansaldo to the debtor. Shortly thereafter Fidelity Bank ("Fidelity") executed a contract ("the Fidelity Agreement") to lend the debtor $600,000.00. The debtor granted Fidelity a mortgage on the realty which was filed on August 17, 1979. At the time of the signing of this agreement a contract ("the Mutual Agreement") was executed by the debtor, Penn and Fidelity which provided at § 6 that: "Penn and Ansaldo shall not extend or modify the [Penn Agreement and related] documents as they concern the amount or term of the loan, the terms of advances and the amount required for releases, without the written consent of Fidelity, which will not be unreasonably withheld."

Several contractors performed work on the project, among whom was Glenn Noret ("Noret") who was on the job between August 12, 1978, until February 20, 1979. Noret filed a mechanic's lien claim against the realty on May 14, 1979, and later filed a complaint under the said claim on August 17, 1979, upon which judgment was duly entered in his favor for $22,000.00. In this proceeding Noret has filed a proof of claim for $23,495.80, plus counsel fees.

Fidelity assigned the debtor's note and mortgage to a partnership known as Commercial Investors Associates ("CIA")[4] for $975,000.00 on September 15, 1981. CIA has close affiliations with the debtor and, in fact, several of CIA's partners are guarantors of the Fidelity loan.

The debtor filed a petition for reorganization under chapter 11 of the Bankruptcy Code ("the Code") on June 11, 1981. At that time five of the lots were improved with fully or partially constructed houses while the remaining sixteen lots were unimproved. After the filing of the petition buyers were located for several of the lots. We ordered that specified lots could be sold free and clear of their liens with the encumbrances attaching to the proceeds of the sale which were later deposited in an interest bearing escrow account.

The debtor is currently in default under the terms of the Penn loan. Such default has triggered the acceleration provisions of that loan which, of course, has rendered the entire debt due and payable. Penn commenced the instant adversary proceeding to determine the priority of the claimants in the escrow fund and for a distribution of that fund. The parties have agreed that Penn has a first lien priority on the first $60,800.00 of the proceeds of each sale.

The first dispute underlying the issue at bench is whether CIA, as a second mortgagee, is entitled to urge the enforcement of the mortgage release clause in the Penn Agreement. If CIA has such a right we must further decide if the debtor's default under this loan agreement terminates CIA's right to obtain the release.

■ The debtor, as mortgagor[5] under the Penn Agreement, would generally have a right to enforce the mortgage release clause prior to default, since it was a party to the contract. In the case law the question occasionally arises as to whether parties other than the mortgagor can enforce the release of the mortgage. In this case the second mortgagee requests that relief. The rule in Pennsylvania provides that

---

ily, involuntarily, or by operation of law assign or transfer any interest which it may have under this Agreement, nor convey the Real Estate or the Site Improvements and Homes, or any part thereof, except under the terms of this Agreement.

**4.** Although CIA was not initially a defendant, we granted its motion for intervention.

**5.** The debtor is not literally the mortgagor but rather the mortgagor's assignee. Nonetheless, the debtor stands in the mortgagor's stead and hereafter we shall refer to the debtor's interest in the mortgage and note as if it arose when his assignor first had such an interest.

"[t]he extent of the right to partial release depends upon the construction of the intent of the release clause in each particular case." *Reilly v. City Deposit Bank & Trust Co.,* 118 Pa.Super. 222, 225, 179 A. 886, 888 (1935) (quotes and cites omitted), *rev'd on other grounds,* 322 Pa. 577, 185 A. 620 (1936).[6] In the case at bench the Mutual Agreement provided that Penn and the debtor would not make certain modifications in the release clause contained in the Penn Agreement without Fidelity's permission. At the time Fidelity granted the debtor the loan, the parties presumably expected that repayment would be funded by the sale of lots in the subdivision. Fidelity apparently realized that its interest in the realty would be subject to greater risk if Penn and the debtor could alter the terms of the release provision without its approval. Thus Fidelity included the restrictions in the Mutual Agreement on the release clause for its own benefit and protection, and, in essence, Fidelity was made a party to that provision of the Penn Agreement. Consequently, we find that the language of the Penn Agreement, as interpreted and augmented by the Mutual Agreement, indicates that the parties intended to grant Fidelity the power to enforce the release provision. Under *Reilly,* this is controlling and determinative.

The second question presented under the first issue at bench is whether the debtor's default under the Penn Agreement bars CIA from enforcing the mortgage release provision. We find that this issue is also governed by *Reilly,* which states in part as follows:

There is a close analogy between the three-year term mentioned in the mortgage and terms mentioned in other contracts where time is not made, by law or by the parties' stipulation, the essence of the contract. Where the passage of time admits of compensation, as it does here (for the interest charge continued), time is not ordinarily the essence of the contract. In *Decamp v. Feay,* 5 S. & R. 323,

this court held that an agreement, after nonpayment on the day stipulated, that if the whole sum should not be paid at a certain day, the prior payments should be forfeited and the original bargain be at an end, does not give any additional right to rescind. In that case Mr. Justice GIBSON, speaking for this court, said: "Where time admits of compensation, as it perhaps always does, where lapse of it arises from money not having been paid at a particular day, it is never an essential part of the agreement."

This interpretation of the contract between the parties "advances the true object and purpose" of the contract and "avoids an unreasonable and unjust result." No possible harm can be inflicted on the appellee by such an interpretation. It will receive by releasing appellant's lots, $800 plus accrued interest, for each lot, and that is all it ever expected to receive or had any right to receive.

\*    \*    \*    \*    \*    \*

Whether the release privilege survives default depends, in the absence of equitable considerations, upon the intention of the parties, to be drawn from the language of the covenent read in the light of the other provisions of the contract and of surrounding circumstances at the time of execution.

*Reilly v. City Deposit Bank & Trust Co.,* 322 Pa. at 584–85 and 588, 185 A. at 624 and 625 (1936) (some quotes and cites omitted). In this case Reilly purchased several lots in a subdivision from the mortgagor. After the mortgagor defaulted under the terms of the loan for failure to make a timely payment during the three year term of the mortgage, Reilly futilely tendered the mortgagee the previously agreed upon sum for release of the encumbrance. The court held that Reilly could enforce the release clause. In expressing the inequity of denying enforcement of the release which would impose upon the purchaser, the court stated

**6.** *See* cases collected at 41 A.L.R.3d 7 (1972) ("Annotation on Construction of Provision in Real-Estate Mortgage, Land Contract, or Other Security Instrument For Release of Separate Parcels of Land as Payments Are Made").

that it was "a forfeiture which the circumstances of the parties and protection of the mortgagee's security interest did not require." *Reilly,* 322 Pa. at 587, 185 A. at 625. Finally, the court noted that it was not the defaulting party who was urging compliance with the release. In the case at bench compliance with the release is sought by CIA, which, of course, is not the mortgagor in default.

Our determination that the parties intended Fidelity to enforce the provisions of the release covenant, goes far toward indicating that the parties intended that Fidelity could compel application of the release after the debtor's default. Fidelity's standing to urge the applicability of the release provision appears to be no different after the default than before it. Its actions have caused no default in the Penn Agreement and its interest in enforcing the release after default seems just as strong as it was prior to default.

Notwithstanding these points, Penn contends that CIA cannot seek enforcement of the release due to equitable considerations that bar the application of the *Reilly* rule. In support of its assertion, Penn very briefly states that CIA is not in the same position as the "innocent lot purchaser in *Reilly*" who was at risk of losing his property; CIA has not been subject to any unethical or questionable conduct by Penn; CIA took the assignment with full knowledge of the debtor's default and subsequent filing for relief under the Code; and CIA is composed of several partners who are individual sureties on the debtor's obligation to Penn. We find that the first two bases for Penn's objection do not undercut the applicability of *Reilly.* CIA, as assignee of Fidelity's right under the loan, has the same right to assert the rule of *Reilly* as Fidelity had. The loan documents gave Fidelity the right to urge compliance with the release provision and CIA, as assignee of these rights, is at liberty to assert them. The third and fourth bases for objection largely overlap and arise from the same equitable basis. In support thereof Penn states as follows:

> [Penn] submits that controlling persons of the debtor have eliminated personal liability to Fidelity by means of a discounted payment and are now attempting to bootstrap themselves through the CIA partnership into a priority position over [Penn] as to the proceeds from the sale of an asset of the debtor's estate. Both equity and law demand that the debtor not be rewarded for its conduct in this case and that judgment be entered for [Penn].

Penn's Memorandum of Law, p. 16. In essence, individuals who were liable as sureties on the debtor's obligation to Fidelity, purchased Fidelity's note and mortgage. Penn's request for us to nullify CIA's ostensible "priority" is tantamount to a request for subordination.

▪ Although no authority has been presented which governs Penn's third and fourth objections, we find that the equitable considerations underlying Penn's request can be analogized to those supporting the doctrine of subrogation. Under subrogation a court can subordinate the claim of a creditor to the claims of other creditors in certain circumstances to prevent the consummation of a course of conduct by a claimant which would be fraudulent or otherwise inequitable. *Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946); *Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939). A court's power is not unlimited and may be used only when the claimant is guilty of some inequitable conduct. *In Re Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980). The fact that a dominant or majority shareholder has lent funds to the corporation is not sufficient to allow the subordination of his claim; a finding of fraud, overreaching or other inequitable conduct is necessary. *Frasher v. Robinson,* 458 F.2d 492, 493 (9th Cir.1972); *In Re Mid-Town Produce Terminal, Inc.,* 599 F.2d 389, 392 (10th Cir.1979). As the Tenth Circuit aptly stated:

> We are unwilling to find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a . . . creditor. To hold the debt may be subordinated on

that basis alone would discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital. We do not think that it is desirable as social policy, nor required by the cases.

Id. at 392. In the case at bench Penn would have us disregard the rule of *Reilly* and effectively subordinate CIA's claim because parties interested in the debtor's survival purchased the debtor's note and mortgage from bank. By applying the above line of cases by analogy we find that Penn's bald averments of inequitable conduct are insufficient to preclude CIA from enforcing the mortgage release provision.

The second issue presented is the order of priority among the competing parties. The parties have expressly agreed that Penn has a first priority in the proceeds from the first $60,800.00 from the sale of each lot. Under *Reilly*, Penn would be entitled to interest for the time the funds have been held in escrow. *Reilly*, 322 Pa. at 584–85, 185 A. at 624. By the terms of the release Penn has no further interest in the proceeds after receipt of this sum.

■ Only Noret's brief has discussed the relative priority of his lien. The facts indicate that he commenced work shortly after the project began, which was approximately one year prior to the Fidelity loan. Since the project was new residential construction we presume that sometime during this one year period the "commencement upon the ground of the work of erecting or constructing the improvement" was visible. The relevant statute states as follows:

§ 1508. Priority of lien

The lien of a claim filed under this act shall take effect and have priority:

(a) In the case of the erection or construction of an improvement, as of the date of the visible commencement upon the ground of the work of erecting or constructing the improvement; and

(b) In the case of the alteration or repair of an improvement, as of the date of the filing of the claim.

49 Pa.Stat.Ann. § 1508. Thus, Noret's priority dates from the time when the work was visible. Even presuming that Fidelity's encumbrance is a purchase money mortgage within the meaning of 42 Pa. Cons.Stat. § 8141(1)(ii), its priority could have arisen no earlier than ten days prior to the filing of its mortgage. Id. Consequently, Noret's lien has priority over Fidelity's.

### ORDER

AND NOW, to wit, this 23rd day of January, 1984, it is

ORDERED that the escrow fund established for the deposit of proceeds of the lots sold in the subdivision be distributed as follows:

(1) out of each lot that is sold, the first $60,800.00 shall be paid to William Penn Savings and Loan Association ("Penn") on account of its secured claim, with interest, until its secured claim is paid in full;

(2) if, after payment of $60,800.00, there is a balance in the hands of the escrowee, then shall be remitted to Glenn Noret, the amount of his proof of claim as filed, with interest, until his claim in the escrow fund is satisfied;

(3) if, after both of the above payments are made, there is a balance in the hands of the escrowee, there shall be remitted to Commercial Investors Associates its secured claim in full, with interest, until its claim in the escrow fund is satisfied;

(4) out of the remaining fund there shall be remitted to Penn the balance of its claim, with interest, until its claim in the escrow fund is satisfied; and

(5) the unpaid balance, if any, shall be remitted to the debtor's bankruptcy estate.