In re TINSLEY AND GROOM, a Partnership, William and Hermer Tinsley, William, Jr. and Peggy Groom, Debtors.

TINSLEY AND GROOM, A Partnership, William Tinsley, Hermer Tinsley, William Groom, Jr. and Peggy Groom, Plaintiffs,

v.

WEST KENTUCKY PRODUCTION CREDIT ASSOCIATION, and Federal Intermediate Credit Bank of Louisville, Defendants.

Bankruptcy Nos. 1–83–00015(B), 5–83–00080(B) and 5–83–00079(B).

Adv. No. 1–83–0053.

United States Bankruptcy Court, W.D. Kentucky.

Nov. 5, 1984.

---

4. See note 1, *supra.*

John W. Ames, Louisville, Ky., for debtors.

Stewart E. Bland, Louisville, Ky., for West Ky. Production Credit Ass'n.

## MEMORANDUM OPINION

G. WILLIAM BROWN, Bankruptcy Judge.

This case comes before the Court on Complaint filed by debtor farmers. At issue is the validity of the "full proceeds loan" agreement between West Kentucky Production Credit Association (PCA) and the debtor-farmers, testing whether such contracts by their nature, provisions and controls, compel a finding that the creditor is an "insider" within the bankruptcy definition together with its ramifications, and/or whether a claim flowing out of such a contract is equitably subordinated for purposes of consideration under Chapter 11 relief.

The debtor-farmers filed this adversary petition alleging improper perfection of a security interest in realty, crops, farm ma-

chinery and equipment; preferential transfers; breach of fiduciary duties; false and material misrepresentations upon which plaintiffs relied to their detriment; breach of contract in wrongfully refusing to furnish funds needed to protect 1982 crops; conduct by defendants in violation of certain statutes and regulations resulting in great financial loss to plaintiffs; exercise of financial controls over plaintiffs such as to cause defendants' alleged secured claim to be disallowed under the theory of equitable subordination.

This action was commenced April 28, 1983, on the above-cited issues and was thereafter litigated in an exhaustive and comprehensive manner by highly skilled counsel with expertise in the applicable bankruptcy law. Following in depth discovery procedures including eighteen depositions and numerous requests for production of documents, a trial was had of the issues presented.

It was established that the individual debtors sometimes operating under an assumed partnership name commenced a credit relationship with the defendant in 1965, and yearly thereafter renewed this loan arrangement by execution of demand or twelve to fourteen-month time notes under an agreement commonly referred to in the farming community as a "full proceeds loan", granting to the lender a secured interest in virtually all assets owned by the debtors. Such loans were primarily intended for operational needs to be repaid on an annual basis and for acquisition of capital assets to be repaid on a short-term intermediate basis not to exceed seven (7) years. Over the course of this relationship, the loan balance grew at a steadily increasing rate, particularly escalating due to a number of substantial capital acquisitions during the period 1974–1978, and by severe adverse production and income difficulties experienced in 1978 through 1982, attributable largely to high interest rates, low crop prices, droughts, and embargos affecting farm income.

Evidence adduced at the trial further established that each yearly renewal application by the debtor-plaintiff included as part thereof a cash flow analysis for the coming year, setting forth in detail the funds needed, including, without limitation: living expenses; amortization of intermediate capital financing; production expenses; interest on the total debt; and miscellaneous needs plus a projection of anticipated revenues to be derived from the crop yields, the type and acreage to be produced.

In each year, except as hereafter noted, the projections of income and needs of the plaintiffs were accepted without modification by the creditor, and the funds applied for were approved. The sole exception to such approval was for the crop year 1982 in which the creditor adopted a fixed projection price for certain specific crops, which projection was higher in dollar amount than that submitted by plaintiffs.

In or about 1972, plaintiffs changed their procedures from that of general farming to a more highly specialized concentration in grain production, accompanied by a systematic acquisition of land and the attendant equipment/machinery to maximize production. These land parcels were generally acquired through short term seller financing plus intermediate creditor financing with PCA.

While harsh criticism and evidence was introduced relative to the lax and/or liberal lending policies and approvals given to plaintiffs' escalating monetary requests and renewals notwithstanding the failure of projections to meet operational expenses and interim capital acquisitions, at issue is the degree of liability, if any, which is incurred by a lender where a debtor's loans are in default due to inaccurate projections and realizations or improvidently financed capital assets.

Based on the case file, testimony and evidence offered at the trial with opportunity by the Court to observe the demeanor of the witnesses, the following are established as facts of the case upon which the substantive issues will be resolved:

1. The information, data, and projections in plaintiffs' loan renewal applications were at all times the work product and

submitted by the plaintiffs in justification of their renewal request. The sole exception thereto (the 1982 crop proceeds projection) did not materially contribute, if at all, to the loss complained of herein.

2. That at all relevant times the plaintiffs relied upon their own conscious business judgment, together with their independent farm market and financial consultant, in the preparation and submission of supporting information accompanying their yearly loan renewal application.

3. That no farm acquisition was the result of coercion, duress, or promotion by the defendant-creditor. Further, that any advice relative thereto was at the solicitation of the plaintiffs for the purposes of assuring the availability of necessary funds from the creditor and not for the purpose of evaluating the prudence or wisdom of such purchase.

4. That each note on its renewal was either a demand or a twelve to fourteen-month term obligation, and understood to be so by each party.

5. That at no time subsequent to the approval of any renewal note did the defendant-creditor exercise any control over the expenditure of any funds thereof, nor refuse to honor any requests thereon to the extent approved funds had been authorized and were as yet unexpended.

6. That all renewal loan applications were within the sole formulation, discretion and prerogative of the plaintiffs as were the projected budgets therein.

7. That renewal applications were not approved on the sole criteria that projected income had to equal or exceed the projected operational expenses and amortization of interim capital assets, said "cash flow" being but one of the factors considered in approving said renewal application.

8. That loan closing letters which approved renewal requests and which qualified or mandated certain conditions precedent to said approval, were in such instances accepted as to such conditions by plaintiff, and were not an unreasonable exercise of control of defendants.

9. That the authorization of $20,-000.00 ± from the 1982 loan proceeds for "futures" or margin calls by Ken Davis, an employee of defendant, was an unauthorized disbursal of loan proceeds for a speculative purpose and was so known by said employee at the time said withdrawals were made.

10. That the Court has jurisdiction over the issues here presented pursuant to 11 U.S.C. and 28 U.S.C. 1331(a), and the defendants PCA and Federal Intermediate Credit Bank (FICB) are agencies and/or instrumentalities of the United States of America. 12 U.S.C. 2091 and 2071, et seq.

11. That debtors relied upon their own conscious business judgment to continue short term interim financing of capital assets with PCA after 1979, notwithstanding advice to convert to long term financing given them by their private consultant and by their realtor.

The plaintiffs submit that controls possessed by the lender under the "full proceeds" program vests in the lender such unilateral control over the borrower's operations as to make the relationship thus created a joint venture between the parties, and compels the lender's claim to become equitably subordinated or the lender deemed an "insider".

In determining whether section 510(c) applies, reference is made thereto which provides in pertinent part:

> [A]fter notice and a hearing, the court may—(1) under principle of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest;

Section 510(c) was intended to codify existing principles of equitable subordination embodied in cases such as *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), H.R.Rep. No. 595, 95th Cong., 1st Sess. 359 (1977), reprinted in 1978 U.S. Code Cong. & Ad.News, 5787, 5963.

■ Further as noted in *Matter of All Products Co.,* 32 B.R. 811 (E.D.Mich.S.D., 1983) at page 815:

To establish that subordination is an appropriate remedy, the proponent must establish the following elements:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Matter of All Products Co.,* supra, citing *Comstock v. Group of Institutional Investors,* 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911 (1948) further holds:

It is not the mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong.

Of like import is *In re Chipin Cliveden Associates, Inc.,* 36 B.R. 760 (E.D.Penn. 1984) which notes at page 764 that subordination of the claim of a creditor is appropriate only to prevent the consummation of a course of conduct by a claimant which would be fraudulent or otherwise inequitable, and that a finding of fraud, overreaching or other inequitable conduct is necessary.

■ Thus equitable subordination is a harsh remedy that is not to be lightly invoked.

■ While the "full proceeds" loan arrangement has been widely used, and in some instances criticized for its retained control provisions, its usage does not mandate a result that all such loans will be equitably subordinated. Rather, each case must of necessity be governed by the unique and distinguishable facts relating thereto to determine whether equitable subordination of the claim is appropriate. Thus, it is not the right of control which is

determinative of such result, but rather the unreasonable, arbitrary, and/or unwarranted exercise of such control in a given case which dictates the applicability of such doctrine.

Here the testimony of plaintiffs' expert witness submits that full proceeds loans are by their very nature unconscionable, demeaning, and create a feudal relationship between the parties. Said expert further denotes the loan officer's power of approval or rejection of a renewal loan application is a control of such magnitude as to impose absolute liability on the lender upon approval of such application should the borrower thereafter default in repayment. He supports this theory on the basis that the borrower's options at the time of renewal are: (1) to seek other financing to liquidate the indebtedness; (2) pay the account in full, or (3) seek approval of a renewal application under such terms and conditions as are wholly the prerogative of the lender.

■ While the power to approve or reject a loan renewal application is a recognized element of control, exercise thereof in a prudent nonarbitrary manner cannot and does not as a matter of law thereafter impute liability for a loan default to the approving officer. This theory, if extended, would preclude any renewal approval lest the lender thereafter forfeit its remedies in event of default. Here a long history of loan renewal requests were approved based solely on the projected needs and repayment representations of the debtor, without sanctions or restrictions as a result of the failure to realize past cash flow projections, and favorably considering additional requested interim financing of capital assets. There is no proof in the record of lengthy trial testimony that the debtors at any time were unaware of the nature of their loan agreement and its provision with the defendant, nor that the creditor at any time and as a condition precedent to approving any renewal application unreasonably withheld credit approval, imposed constraints on debtors' right to manage and operate its farming venture, or interfered in financial decisions attendant thereto.

All witnesses testified as to the honesty, integrity, dedication, and cooperation by the debtors in operating their farm business. The specialization and growth of their farm activities attest to their desire to achieve a prosperous state in life. During those years of good crop yield, market prices and escalating land values, the growth was sustained in large measure by leverage borrowing from the defendant. When adversity struck in the form of low crop prices, high interest rates, drought, and other factors beyond the control of either debtor or creditor, the undercapitalization of this venture and the resultant inability to service the debt load became apparent. Debtors now seek to avoid the consequences of its own actions by transfer of the unfortunate loss to the lender who financed the venture.

█ Giving the greatest weight to the most damaging testimony against the defendant's lending practices establishes only a lending policy which was liberal in approving renewal applications, accepting at face value debtors' projections, relying heavily on the character and ability of the debtors, and financing the debtors' over-zealous goals. Such policy, while perhaps not a sound or prudent lending practice, falls short of imposing culpability for the results which debtors' actions eventually occasioned.

The testimonial history of the relationship between the parties convincingly establishes there was no joint venture nor improper dominion or control asserted by P.C.A. From 1974 to the filing of this petition plaintiffs were represented by their independent consultant and from 1978 by a knowledgeable realtor in plans and formulation of their farming needs. Testimony further establishes that plaintiffs, notwithstanding advice given by their personal consultants, at all times exercised their independent business judgment.

It is the opinion of the Court based on the totality of evidence presented that plaintiffs have failed to establish the defendant-creditor was guilty of fraud, over-reaching or inequitable conduct in its course of dealing.

█ This court further finds a fiduciary relationship did not exist between the parties hereto; that defendant creditor was not an "insider" as defined in 11 U.S.C. 101(25) nor was defendant-creditor guilty of false and material misrepresentations upon which plaintiffs relied to their detriment.

Plaintiffs further allege under Count V, defendant wrongfully refused to furnish funds needed to protect the 1982 crops. The evidence in this respect indicated additional funds were needed in 1982 to spray crops since the loan proceeds available for 1982 had been virtually exhausted. Further testimony by P.C.A. was to the effect these additional funds were approved but were not thereafter formally requested by plaintiffs. In essence there is no proof that the funds here in question were denied plaintiffs and that this isolated incident was substantially instrumental in the failure of this farming enterprise.

█ As to Count VII alleging the defendants were in violation of certain statutes and regulations resulting in great financial loss to plaintiffs, the evidence established that the loan applications were in fact all approved as requested and any technical violations inured to the benefit of the plaintiffs and the resulting financial loss was not attributable to any such claimed deviation from applicable statutes and/or regulations. The claimed improper authorization of fund proceeds for "futures" investments occurred in early 1982. It was uncontroverted that speculation in the future markets is not permitted with loan proceeds, however, a forward advance contract or "hedge" would be permitted. The plaintiffs request for loan proceeds to cover "future" losses occurred after the actual incurring of such losses. While sufficient funds were in fact advanced by creditor's employee Davis knowingly to cover such losses, such withdrawals were to cover the debtor's liability on these speculative investments, were approved at the instigation of the debtors, and did not material-

**92**

ly or adversely affect the ultimate outcome of debtors financial crisis. In sum, the debtor should not now be heard to complain of the results of their own actions.

Debtors further challenge the validity of P.C.A.'s alleged security interest in certain crops and equipment pursuant to KRS 355.-9–101 *et seq.*

The issues as narrowed are: (1) whether P.C.A. properly perfected a lien against crops grown in Trigg County and stored in Christian County after harvest; (2) whether P.C.A. possesses a valid lien against crops grown and stored in Christian County but commingled in storage with crops grown in Trigg County; and (3) whether P.C.A. identified crop and equipment collateral sufficiently on financing statement to notice third parties of P.C.A.'s interest therein.

Debtors-in-possession seek a determination that P.C.A. is unperfected regarding certain crops grown and stored and equipment, subordinating P.C.A.'s acclaimed interests therein to debtors' estate by application of 11 U.S.C. § 544,[1] § 1107,[2] and 547.[3]

 The Court finds that P.C.A. properly perfected liens against all crops stored in Christian County, irrespective of where grown, and further that P.C.A. properly perfected a security interest in certain of debtors' equipment. The following facts are set forth as support for these legal conclusions.

For several years, P.C.A. financed farming operations of debtors-in-possession (hereinafter debtors) pursuant to a full proceeds loan arrangement. As security for the monies advanced to debtors, P.C.A. claims a secured interest in (1) debtors' crops grown and stored in Christian County; (2) debtors' crops grown in Trigg County but stored in Christian County; and (3) all farming equipment owned by debtors.

Although P.C.A. filed security documents properly in Christian County, listing "all crops growing" and "all crops stored" as being subject to the parties' security agreement, no financing statement was filed in Trigg County. These Trigg County crops were harvested and thereafter stored in Christian County being commingled in storage with the Christian County crops.

Debtors now urge a finding that notwithstanding the financing statement of record in Christian County which covers all stored crops, P.C.A.'s interest in crops grown in Trigg County remains unperfected even though the crops were harvested and stored in Christian County. Debtors argue that this finding is mandated by language of KRS 355.9–401 which provides that:

(1) The proper place to file in order to perfect a security interest is as follows:

(a) ... When the collateral is crops, in the office of the county clerk in the county where the land in which the crops are growing or to be grown is located.

To determine the rights of parties claiming an interest in stored crops, the collateral must first be classified. KRS 355.9–109(3) defines "farm products" to include

---

1. § 544 grants the trustee the right to avoid any obligation incurred by debtor which is avoidable by a creditor with a judicial lien on the property, by a creditor with a writ of execution against the property, and by a bona fide purchaser of the real property of debtor as of the date of the petition.

2. § 1107 vests all rights and powers of a trustee in the debtor in possession.

3. § 547(b) provides that the trustee may avoid any transfer of property of the debtor—(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made

while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of the petition; or (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—(i) was an insider; and (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and (5) that enable such creditor to receive more than such creditor would receive if—(A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

crops produced in farming operations. However, this provision further provides that goods classified as farm products are neither equipment nor inventory.[4] As stated in the Kentucky commentary to KRS 355.9–109, the classes of goods are mutually exclusive but goods can fall into different classes at different times. The commentary further provides that goods are "farm products" only if possessed by a debtor engaged in farming; however, crops possessed by one not engaged in farming become inventory. Thus, the grain grown in Trigg County but thereafter stored in Christian County changed classification from farm products to inventory. Thus, P.C.A.'s error in failing to file in the county where the Trigg County crops were grown did not impair proper perfection of the crops when they became inventory. Such collateral was subject to the financing statement filed in Christian County, the county of debtors' residence and county where this collateral was located prior to commencement of this bankruptcy proceeding. Thus, debtors' rights as a hypothetical lien creditor are subrogated to P.C.A.'s perfected interests in all crops stored in Christian County.

■ Debtors' argument that P.C.A. lost its perfected status when crops stored in Christian County were commingled with crops grown in Trigg County is unpersuasive. KRS 355.9–315 clearly provides that a perfected security interest in collateral continues when such becomes part of a mass.[5]

■ Debtors further allege that perfection of P.C.A.'s interest in stored crops created a preference as defined by 11

U.S.C. 547(b) and is thus avoidable by debtors. As concluded by the Court and set forth above, P.C.A. is not deemed as insider in this proceeding. The burden thus falls upon debtors to prove P.C.A.'s perfection regarding stored crops occurred within 90 days of commencement of the bankruptcy proceedings. No evidence was offered by debtors to show when the Trigg County crops were harvested and subsequently stored in Christian County. Therefore, debtors failed to meet their burden of proof on this issue and cannot avoid P.C.A.'s perfected security interest although vested with rights of a trustee.

Debtors next challenge the adequacy of description of collateral appearing on the financing statements filed in Christian County. The financing statements described crop collateral as 'Members' share of 'crops growing or stored' and described equipment as 'all farm machinery and equipment including but not limited to tractors, tanks, tilling and harvesting tools.' Debtors rely upon *In re Anselm*, 344 F.Supp. 544 (W.D.Ky.1972) and *Mammouth Cave Production Credit Association v. York*, 429 S.W.2d 26 (1968) for their contention that descriptions are inadequate for perfection of P.C.A.'s interest therein.[6]

■ As this Court held in *In re Pendleton*, 40 B.R. 306 (W.D.Ky.1984), a financing statement is sufficient to give notice to a third party of a creditor's secured claim if the financing statement contains "a statement indicating the types, or describing the items of collateral". KRS 355.9–401(1). The sufficiency of descriptions is further addressed by KRS 355.9–110 which provides:

**4.** KRS 355.9–109(4) defines as "inventory" those crops "held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has to furnish them, or if they are raw materials, work in process or materials used or consumed in a business."

**5.** KRS 355.9–315(1): If a security interest in goods was perfected and subsequently the goods or a part thereof have become part of a product or mass, the security interest continues in the product or mass if
 (a) the goods are so ... commingled that their identity is lost in the product or mass.

**6.** These cases dealt with the issue of whether a single document, a financing statement, sufficiently described collateral for a finding that the parties' security agreement had attached thereto. In the instant case, the collateral subject to the parties' security agreement is not in question; rather, the issue is only whether third parties were noticed that the parties' agreement may attach to certain collateral and gave a means to identify such collateral with specificity.

For purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

The Kentucky Court of Appeals construed this provision to mean:

An adequate description [in a financing statement] need not describe the property with utmost particularity, but it is sufficient if the facts shown would enable a third party, assisted by external evidence, to identify it.

See *In Re Drane*, 202 F.Supp. 221, at 224 (W.D.Ky.1962), citing *Liberty National Bank and Trust Co. v. Miles*, 259 S.W.2d 474 (1979). See Also *Matter of Cooley*, 624 F.2d 55 (6th Cir.1980).

In *In Re Pendleton*, supra, the description of "all equipment, livestock, including products thereof, and proceeds" was held to be a sufficient description in the financing statement to cause a reasonable third party to inquire as to external sources available which specified property subject to the security agreement. See also *Matter of Cooley, supra; Bank of Danville v. Farmers National Bank of Danville*, 602 S.W.2d 160 (1980). Appropriate among sources of information identifying collateral with specificity is the security agreement to which a financing statement relates. See *In Re Pendleton*, supra; *In Re All-Brite Sign Service, Inc.*, 11 B.R. 409 (W.D.Ky.1981).

In the case at bar, the types of collateral subject to the financing statement were identified and the names and addresses of debtors and P.C.A. as creditor provided a means for a third party to inquire and have defined, if questioned, 'Members' share of 'growing or stored crops' and "all equipment" subject to the agreement of the parties as set forth specifically in the security agreement. The duty to seek specific identification of encumbered property is upon a noticed third party, rather than incumbent upon a creditor to file the security agreement containing specific descriptions of all collateral, as debtors contend.

The Court thus finds that the financing statements were adequate to notice a third party that certain collateral might be subject to a creditor's interest, and further provided means for a third party to identify such specific collateral.

For above reasons, P.C.A. is found as a matter of law to have perfected its secured interests in debtors' equipment, machinery, and crops, said interests not defeated by debtors' status as a hypothetical lien creditor.

Finally, debtors claims set forth as Counts VIII and IX were disposed of by directed verdict at the trial in chief, the basis therefor as announced by the Court being incorporated herein by reference.

In addition Count X seeks punitive damages against defendants. Since the plaintiffs have failed to prove a right to damages against the defendants under Count I through IX and for the further reasons announced by the Court at the trial in chief and which are incorporated herein by reference, the claim for relief under Count X is hereby denied.

The above constitutes findings of fact and conclusions of law pursuant to Rules of Bankruptcy Procedure 7052. An appropriate order dismissing plaintiffs' Complaint has been entered this the 2nd day of November, 1984.