**In re Frank GIORGIO and Pauline Giorgio, Debtors.**

**John BOYAJIAN, Trustee/Plaintiff–Appellee,**

**v.**

**Alan J. DeFUSCO and Anita DeFusco, individually and in their capacities as co-executors of the Estate of Pasco DeFusco, Defendants–Appellants.**

**Civ. A. Nos. 87–121B, 122B.**

United States District Court, D. Rhode Island.

Jan. 15, 1988.

Zechariah Chafee, Providence, R.I., for defendant-appellant—Alan DeFusco.

William J. McGair, Providence, R.I., for defendant-appellant—Anita DeFusco.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is an appeal from a decision of the Bankruptcy Court reported at 62 B.R. 853, July 2, 1986.[1] The Appellants claimed to be creditors of the bankrupts. They come to this Court, however, as debtors, rather than creditors. How this happened, why it happened, and whether or not it should have happened will be the subject of this opinion.

Pasco DeFusco deceased in May of 1981, survived by his wife Anita and his son Alan. The bankruptcy proceeding was begun by Frank and Pauline Giorgio in 1983. Appellants Alan J. DeFusco and Anita DeFusco are executors of the Will of Pasco DeFusco. They claimed that the bankrupts, Frank Giorgio and Pauline Giorgio owed the estate $41,445 by reason of a judgment of the Superior Court of the State of Rhode Island. Instead, the Bankruptcy Court either denied the claim or subordinated the claim to the claims of other unsecured creditors, and, determined that they, *qua* executors, and Alan J. DeFusco individually, were indebted to the bankrupts in the amount of $137,716. How this turnabout happened must now be explained.

The evidence, most favorably viewed from the appellee's point of view is this. In 1969, some eighteen (18) years ago, Frank Giorgio, an "admitted" compulsive gambler, began borrowing money from Pasco DeFusco. Interest was calculated at the rate of 10% per week. By 1973, Giorgio had paid at least $50,000 to DeFusco for loans of not more than $20,000 with no reduction of the principal debt.[2] At this

Andrew S. Richardson, Boyajian, Coleman & Harrington, Providence, R.I., for trustee/plaintiff-appellee.

1. Although this appeal bears a 1987 date in this Court, it really involves a bankruptcy proceeding begun in 1983 and a complaint filed in 1984.

2. The transcript is simply not this clear. Mr. Giorgio did not know what he owed Mr. DeFus-

co. Tr. 6/20/85, pp. 52–53. This is a rather remarkable lack of knowledge since he claimed that he was obligated to interest in the amount of 10% of the *balance due* each week. The maximum weekly amount he paid was, he said,

time, Mrs. Giorgio became aware of the circumstances, negotiated an agreement that the principal debt was $19,000, and arranged for repayment at the rate of $200 per week. Alan J. DeFusco, the son of Pasco DeFusco, arrived at the debtors' place of business on Monday mornings of each week to collect the tribute due of $200, over a period of two years from 1977 to 1975. Other payments not collected by Alan J. DeFusco were delivered to Pasco DeFusco by Mrs. Giorgio's son. By September of 1975, the entire debt of $19,000 had been paid. At this point Mr. Giorgio asked Mr. DeFusco to loan him some more money. Mr. DeFusco obliged. He took a promissory note from Mr. and Mrs. Giorgio in the amount of $44,000 but advanced only $25,000, according to Mrs. Giorgio paid in five $5000 checks, contending that he was still due $19,000 because he had received no interest during the two years when the initial loan of $19,000 was being repaid. This transaction was a curious exercise in silence because Mr. Giorgio testified that he did not tell his wife about the additional $19,000. (Tr. 6/20/85, pp. 25, 66). Mr. Giorgio testified that the subject was discussed in a whispered conference between Mr. DeFusco and Mrs. Giorgio not "overheard" by Mr. Giorgio even though he was seated next to her when Mrs. Giorgio objected to the additional $19,000. (Tr. 6/20/85, pp. 66–72). The meeting took place at the office of Pasco DeFusco's attorney. The attorney testified that there was no such whispered conference. (Tr. 7/3/85, pp. 4–9).

Both Mr. and Mrs. Giorgio signed the promissory note prepared by Mr. DeFusco's lawyer. They signed the note because of their then "desperate" need of funds. Although the principal sum of the note was $44,000, with interest at the rate of 15%, only $25,000 it is contended was advanced. $19,000 was "past consideration" or "future interest" depending on one's point of view.

The note was executed on September 8, 1975. Forty-four payments were made on the note until November of 1976, totaling $15,429.[3] In January of 1977, Mr. DeFusco brought an action in the Superior Court, Kent County, State of Rhode Island, seeking payment of the balance of $33,265.67 then due on the note. One of the defenses asserted was usury. When the trial date arrived on November 25, 1977 the parties entered into a consent judgment signed by the bankrupts in the amount of $38,000. When payment was not forthcoming Mr. DeFusco obtained an execution and levied on real estate of the Giorgios. The Giorgios, almost one year after the judgment, moved to vacate the consent judgment and to recall the execution, claiming that the consent judgment was entered as a result of duress or coercion.

The Rhode Island Supreme Court described the action of the superior court as follows:

> After a hearing on these motions, the trial justice determined that, prior to signing the consent judgment, the Giorgios had been fully advised by competent counsel of their rights and of the ramifications of the entry of such a judgment. Concluding that the Giorgios had not satisfied their burden to establish that the judgment was entered by "mistake, accident, or duress, or misrepresentation," he denied the motions.

*DeFusco v. Giorgio*, 440 A.2d 727, 729 (Rhode Island 1982).

The denial by a justice of the superior court was appealed to the Rhode Island Supreme Court. The supreme court affirmed the superior court in a published opinion in *DeFusco v. Giorgio*, 440 A.2d 727. In order to appreciate fully the impact and effect of the opinion of the Rhode

---

$900 or $1,000. (Tr. 6/20/85, pp. 48, 54). In fact the testimony could be read to mean that interest was $200 a week. (Tr. 6/20/85, p. 48, colloquy, pp. 49–51). The facts suggest a loan of not more than $9,000 or $10,000 not $19,000. There was no written record of any of these transactions, either the debt or the payment.

3. The payments were allegedly made by bank checks the records of which at the time of hearing were "unavailable."

Island Supreme Court, it is necessary to quote from it at some considerable length:

"The Giorgios bore the burden of convincing the trial court that legally sufficient grounds, as specified under Rule 60(b), existed to warrant vacating the judgment. *See Pasquazzi v. Pasquazzi*, 119 R.I. 554, 555, 381 A.2d 233, 233–34 (1977). To this end they attempted to show that their consent to the judgment had not been given voluntarily, but rather was a result of duress and coercion. Pauline Giorgio testified that on the day she signed the consent judgment, she was extremely distraught. She stated, 'Anything could have been put before me at that time of the day on that particular day, and it would have been completely incomprehensible to me at that time.' She explained that she agreed to the judgment out of fear for the safety of her son who had been bringing the weekly payments on the note to DeFusco. Her fear, she stated, stemmed from the possible consequences she perceived might follow if she testified about 'loan sharking' activities of DeFusco. The foundation for her perceptions appears to be limited to the alleged experience of a personal friend who also owed DeFusco money. Mrs. Giorgio elaborated:

'We have a personal friend of ours who had borrowed money from Mr. DeFusco and was paying him also on a weekly basis, and the weekly money he was bringing to Mr. DeFusco was never deducted from the principal either, and on one occasion he went to Mr. DeFusco's house to tell him he would no longer keep the payments up, and at that time, he was assaulted by Mr. DeFusco and later the individual brought charges against Mr. DeFusco. I feel and really believe, and still do, that he is capable of such a thing.'

"Mrs. Giorgio did not allege that DeFusco had at any time made specific threats against her or members of her family. Further, the record contains no indication whatsoever of any coercion exerted by DeFusco before or during the period elapsing from the institution of his suit to the entry of the consent judgment. Although Mrs. Giorgio believed that her attorney was aware of how she felt about DeFusco with regard to his 'loan sharking' activities, she admitted that on the day she signed the consent judgment she did not inform her attorney that she feared for the physical well-being of her son. Furthermore, she agreed that her attorney had advised her of the nature of the judgment and that she had not objected to any of its terms. Mr. Giorgio took the stand only briefly, stating that he agreed with the testimony of his wife.

"In rebuttal DeFusco called the Giorgios' former attorney, who testified that he believed the Giorgios had signed the judgment voluntarily and willingly. He added that they did not appear to be under duress when it was signed; that Mrs. Giorgio appeared no more nervous or upset on that day than she had on other occasions when they discussed the case and other matters he had handled for them; that Mr. Giorgio seemed fully aware of what he was signing; and, finally, that he had advised Mr. Giorgio that if they settled the case, they waived their right to have a court determination that the loan was usurious and unenforceable. In the face of such advice, he was instructed by Mr. Giorgio to work out a possible arrangement with DeFusco's attorney to settle the case. DeFusco also presented the testimony of an individual who had been present at the meeting with Mr. Giorgio and his attorney on the day set for trial in this matter. This witness testified that Mr. Giorgio had informed his attorney 'that he wanted to have the case settled at all costs because of adverse publicity that would result from the case if it was heard.'

"... Recognizing the clear legislative intent to provide severe penalties against lenders who violate the usury laws, we concluded that the remedy granted to borrowers was not restricted merely to a defense of actions by lenders on usurious loans, rather it entitled borrowers to bring affirmative actions against such lenders to recover any payments of principal or interest they may have made. It should also be noted that § 6-26-3, as amended by P.L. 1970, ch. 263, § 1, makes a willful and

knowing violation of the usury laws a criminal offense punishable by imprisonment for up to five years.

"A strong public policy against usurious transactions is clearly manifested by these provisions. Nevertheless, we do not believe that the Legislature intended thereby to preclude a debtor from waiving a defense of usury under all circumstances. We emphasize that the case at bar does not present a situation in which a borrower has executed a release of all claims or defense of usury either contemporaneous with the signing of a promissory note or in exchange for additional advances of funds. The coercive nature of such situations, in light of the pressing financial needs of the borrower, has persuaded many courts to hold such releases invalid as contravening state usury statutes. *See* cases collected in annot. 99 A.L.R. 600 (1935).

"In our opinion, however, waiver of a usury defense should be permitted when it is *freely and knowingly made after reasoned reflection for the legitimate purpose of avoiding or settling litigation. See Shoenfelt v. Donna Belle Loan & Investment Co.*, 172 Okl. 346, 348, 45 P.2d 507, 509–10 (1935); *see also Siegal v. Lechler*, 130 Colo. 338, 342–43, 275 P.2d 949, 951 (1954); *Gunn Plumbing, Inc. v. Dania Bank*, 252 So.2d 1, 4 (Fla.1971). The instant case falls within this narrow category of cases in which a debtor's release of a usury claim is not merely a subterfuge to evade the usury statutes. The Giorgios concede that the note in question is not usurious on its face. Indeed, the facts surrounding its execution, which facts might support their claim of usury, are hotly disputed by the parties. Furthermore, having rejected the Giorgios' claim of duress, it is reasonable to infer that the trial justice gave great weight to the testimony of the one witness uninvolved in the litigation who stated that the motivation for the Giorgios' decision to consent to judgment was their desire to avoid the adverse publicity they believed would accompany such litigation. For these rea-

sons, we think the Giorgios should be bound by their decision to release any potential defense of usury."

*Id.* at 730–32.

In May of 1981 Mr. DeFusco died and Appellants were appointed his co-executors by the Probate Court of the City of Warwick. A final account was allowed by the probate court in 1982 showing no remaining assets, although the estate remains open principally because of the bankruptcy claim based on the September 8, 1975 note.

On April 7, 1983, Mr. and Mrs. Giorgio filed a joint Chapter 13 petition in the Bankruptcy Court. On July 19, 1983, the executors of the will of Pasco DeFusco filed their claim based upon the 1975 note seeking payment in the amount of $41,445. The trustee in bankruptcy on January 26, 1984 filed a complaint and later an amended complaint against not only the executors of the will of Pasco DeFusco but also against his surviving spouse Anita and his son, Alan DeFusco individually.[4] The complaint was in five counts. Count one sought recovery of $15,429 as payments made to satisfy a usurious loan evidenced by the promissory note dated September 8, 1975. As indicated the payments were made between September 1975 and November 1976. Count two sought return of $19,000 paid to Mr. DeFusco between 1973 and 1975 as payments made on another earlier alleged usurious loan. The payments were made at least eight years before the bankruptcy. It is also clearly not the same $19,000 which was the "boot" in the note of September 8, 1975 in accord with the explanation of the purpose of this payment by both parties, that is as either past or future interest. Count three was a claim alleging "loansharking" under the Rhode Island version of the federal RICO act seeking treble damages because, as alleged in the complaint, the executors sought a stay of the bankruptcy proceeding to allow them to conduct an execution sale of the debtors' property pursuant to the judgment of the

---

4. How service of this complaint against the executors in their individual capacity was accomplished is not a fact of record. How the decedent's surviving spouse and son could be liable individually for usury based upon loans made by their husband and father is totally without explanation in the record.

State Superior Court, an action which was described in the complaint as an "attempt to collect an unlawful debt." Count four asserted a similar RICO claim under the federal RICO statute. This count was dismissed by agreement. Count five sought the subordination of the executors' claim to all other claims due to the "nature of the defendants' (executors) claim."

The complaint was brought against both executors as executors and also in their individual capacity. The claim against Mrs. DeFusco individually was dismissed by agreement because of lack of evidence. The trustee insists in this court that he has a claim against the decedent's son both in his individual and in his fiduciary capacity. It is to be noted that it is undisputed the decedent's son did not make a loan to the bankrupt, although he has here ultimately been held liable for "loansharking."

The Executors responded to the amended complaint, asserting twenty-five numbered defenses. Among the defenses were *res judicata*, collateral estoppel, waiver, statute of limitations and failure to file a precedent claim in the probate court. Defendants Appellants demanded a trial by jury.

Ultimately, the matter was set for hearing by the Bankruptcy Judge on February 4, 1985. On January 14, 1985 a petition to withdraw the matter from consideration by the Bankruptcy Court was filed in this Court under the provisions of 28 U.S.C. § 157(d). The petition was denied because the application was "not timely" as required by § 157(d) *Boyajian v. DeFusco* (*In Re Giorgio*), 50 B.R. 327 (Bankr.D.R.I. 1985). The matter was thereafter heard in a bench trial by the Bankruptcy Judge. in June and July of 1985.[5]

The Bankruptcy Judge announced his decision about a year later on July 2, 1986. He granted judgment against the executors of the will of Pasco DeFusco and against Alan J. DeFusco individually in the amount of $34,429 representing total payments made by Mr. and Mrs. Giorgio both before the execution of the 1975 note and after the execution of the 1975 note judgment of three times that amount or $103,287 on the State RICO count, and disallowed "or alternatively" subordinated the claim of the executors to those of the general creditors. This appeal ensued.

The Bankruptcy Court generally discredited the testimony of witnesses in support of the executors' claim and accepted the testimony of witnesses opposed to the executors' claim. Of course, the only witness who could authoritatively present the claimant's argument, Pasco DeFusco had by then been silenced by death. On the issue of expiration of the statute of limitations, the Bankruptcy Court reasoned that the consent judgment in 1977 involving only the promissory note of September 8, 1975 was an "acknowledgment of all prior indebtedness" (including apparently $19,-000 not involved in or related in any way to the note) causing the statute of limitations to be revived and to begin to run on November 25, 1977. *Boyajian v. DeFusco* (*In re Giorgio*), 62 B.R. 853, 861 (Bankr.D.R.I. 1986). Since the debtors' petition to the Bankruptcy Court was filed on April 7, 1983 and within six years (the applicable limitations provision) of the date of the consent judgment, under the provisions of 11 U.S.C. § 108, the trustee had an additional two years to commence the action and his filing of the initial complaint on January 26, 1984 was therefore timely.

The Bankruptcy Court held that the doctrine of collateral estoppel does not apply in this context because the usury claim had not previously been litigated. It held that the defense of *res judicata* was not available because the trustee was not a party to the state court action or in privity with a party and that the interests of the bankruptcy estate were not protected by the state court proceeding. It held that "the

5. The previous demand for jury trial obviously became a "whimper." None of the parties object to the determination of the issues by the Bankruptcy Judge although the bankruptcy judge was not so certain of his circumstances. The record establishes that he considered his

determination was either reviewable as a final determination or as a recommendation. *See Boyajian v. DeFusco* (*In re Giorgio*), 62 B.R. 853, 856 (Bankr.D.R.I.1986) (Footnote 3 of the Bankruptcy Judge's opinion).

dispositive issues have not been previously litigated in another forum by the trustee (or anyone else, for that matter)." *Id.* at 863. In a footnote the Bankruptcy Court noted that when in 1977 Mr. and Mrs. Giorgio waived a claim of value "for no consideration and for reasons personal to themselves, at a time when they were insolvent" (six years before the bankruptcy), *Id.* at 863,[6] that the trustee (who was not appointed until 1983) would not have agreed to the consent judgment in 1977 and would have difficulty obtaining the approval of the Bankruptcy Court to do so. The Bankruptcy Court also noted in a footnote that the RICO claim was not subject to the defense of *res judicata* because the consent judgment was entered in 1977, two years before the enactment of the Rhode Island RICO statute in 1979. The advantage of hindsight is clear. The only more accurate view of what has happened is to be able to cause events to run backward beyond the litigation of the parties in state court. The Bankruptcy Court's opinion did just that.

This Court concludes that the validity of the bankrupts' assent to their liability was litigated and is *res judicata.* This Court concludes that enforcement of a valid state court judgment cannot be considered to be "loan sharking" and appropriate equities being considered, appellants' claim should be allowed.

■ The Bankruptcy Court, observing that *res judicata* "shields the fraud and the cheat," *Brown v. Felsen,* 442 U.S. 127, 132, 99 S.Ct. 2205, 2210, 60 L.Ed.2d 767 (1978) and that *res judicata* renders "white that which is black and straight that which is crooked," *Jeter v. Hewitt,* 63 U.S. (22 How.) 352, 364, 16 L.Ed. 345 (1859), concluded that it was not inclined "to condone or permit such results on the facts before us." *Boyajian v. DeFusco (In re Giorgio),* 62 B.R. at 862. It is understandable that a court would be disinclined to deprive legitimate creditors of payment to satisfy the claim of a wrongdoer. Certainly, no court should lend its resource to the en-

forcement of claims which are illegal. The decision relied upon cases which generally state the proposition that a Bankruptcy Court is not bound by determinations of other courts. Few of them involve a "one on one" contest between the debtor in bankruptcy and the creditor who seeks payment. Many of the authorities relied on by the Bankruptcy Court and the Trustee are inapplicable simply because they hold that the issue considered by the Bankruptcy Court, that is allowability of a debt among others, was not and usually could not have been determined by the precedent litigation. In this instance a state court determined that the bankrupts could and did validly waive a claim for usury.

The Bankruptcy Judge relied upon *In re Kreiss,* 46 B.R. 164 (Bankr.E.D.N.Y.1985) which held that a bankruptcy court was not bound by a state court determination of the validity of codicils to wills because of lack of privity, *i.e.,* the interest of creditors, was not represented in the state court proceeding. The court held there was no identity of interest between the trustee and the debtor. The only issue was, whether the trustee could examine witnesses to the execution of the codicils (signed six days before bankruptcy) with respect to the formalities of execution. The Bankruptcy Court also relied upon a decision of the Fifth Circuit in *Coleman v. Alcock,* 272 F.2d 618 (5th Cir.1960). In that opinion the court considered the effect of a state court determination of transactions between the bankrupt, a claimant, and stockholders of both the bankrupt and the claimant as not being a fraud on creditors. The court specifically observed that the state court result must be confined to simply the one creditor involved in the state court proceeding. *Id.* at 624. Appellants seek nothing more in this proceeding.

In *In re Kreiss,* 46 B.R. 164 (Bankr.E.D. N.Y.1985), the bankruptcy court authorized an inquiry into the validity of the method of execution of codicils establishing a discretionary trust seven days before the

---

**6.** There is no evidence that the bankrupts were then "insolvent" although clearly they were in need of funding. Whether, solvent or not, there is nothing to suggest the relevance of the debtor's financial circumstances six years before their bankruptcy.

bankrupt beneficiary filed his bankruptcy petition. This inquiry was authorized despite a state court determination that the codicils had been validly executed. Obviously, the nature of the inquiry and its purpose was to determine if there were any "secret" agreements among the parties which would make the trust illusory. This decision has no application to the circumstances here under review.

The Trustee relies upon *In re Shuman*, 68 B.R. 290 (Bankr.D.Nev.1986), *aff'd Shuman v. McDonald (In re Shuman)*, 78 B.R. 254 (Bankr. 9th Cir. (1987)) and *In re Hamlett*, 63 B.R. 492 (Bankr.M.D.Fla.1986) which stand for the general proposition that a bankruptcy court will not permit legalistic sleight of hand to avoid the legitimate demands of creditors. Neither applies to this action.

The state court litigation involved in this action took place in 1977, six years before the bankruptcy. There is not the slightest suggestion that any of the parties were then casting a jaundiced eye toward bankruptcy. There is absolutely no basis to suggest that the 1977 consent judgment was intended or calculated to affect a bankruptcy of the debtors which occurred six years thereafter. There is nothing to remotely suggest that the 1977 consent judgment was not a good faith resolution of a dispute, including the issue of usury. It has been held to be a valid resolution by the highest court of this state. There is simply no factual basis to impeach the state court judgment, if, indeed, impeachment was permissible.

Further, there is a decisive consideration and determination by the state court that the basic consent judgment in part waiving the issue of usury was not the result of duress or coercion. Whatever else may be said, that determination under any understanding of the doctrine of *res judicata* ought to be held to be conclusive against any who might seek to challenge it. The debtors' motion to vacate the consent judgment was heard and denied by the superior court and, after an extended discussion and analysis, affirmed by the Rhode Island Supreme Court. It is of course appropriate to

reopen fraudulent judgments, but to reopen litigated issues invites obvious disaster. It is not appropriate for a Bankruptcy Court to reverse the judgment of the highest court of a state that a debtor may waive a claim of usury.

The mischief which the Bankruptcy Court's decision suggests is sufficient to bring the effective resolution of most disputes to an abrupt and absolute halt. What the Bankruptcy Court has done is to reopen a dispute judicially resolved by a judgment between the parties many years before. Were this principle applied to all resolutions whether by stipulation, consent judgments or verdict each resolution would be subject to revision and possible reversal by a Bankruptcy Court many years thereafter. Most or all litigation would be destined to ultimate and belated determination in a Bankruptcy Court.

These circumstances calls for a classic application of the doctrine of *res judicata*.

It is true that in the bankruptcy context the doctrine of *res judicata* is less vital than its application in other areas of the law. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1978); *Heiser v. Woodruff*, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1945), *reh'g denied* 328 U.S. 879, 66 S.Ct. 1335, 90 L.Ed. 1647 (1946). In *Brown v. Felsen*, a bankrupt had stipulated in state court to a judgment in an action in which the judgment creditor alleged misrepresentation and non-disclosure of material facts by the bankrupt. The judgment debtor was denied a discharge of the debt because of fraud in spite of a contention that the state judgment was *res judicata*. *Brown v. Felsen*, 442 U.S. at 127, 99 S.Ct. at 2205.

The Bankruptcy Court in this instance, however, took the doctrine further. Not only did the court review the consent decree from the point of view of the validity of the underlying claim, it permitted a litigation against a party to the consent decree upon an issue which had been raised and irrevocably resolved in the state court action, to wit: waiver of a claim of usury, and afforded to the trustee affirmative relief. In this, the Bankruptcy Court erred.

The authorities which it cites as well as those cited by the Appellee do not support the additional offensive use of the Bankruptcy Court's authority which, in effect, reversed a determination in the state court proceeding and which under any conventional view of *res judicata* is barred. This matter is not unlike *Heiser v. Woodruff,* 327 U.S. at 726, 66 S.Ct. at 853. As was pointed out in that opinion although a proof of claim based on a judgment may be assailed in the Bankruptcy Court because of lack of jurisdiction or fraud on the court entering it—"it is quite another matter to say that the bankruptcy court may reexamine the issues determined by the judgment itself. It has from an early date been held to the contrary." *Id.* at 736, 66 S.Ct. at 858. There the Supreme Court determined that a bankruptcy court may not disregard the principle of *res judicata. Id.* at 737, 66 S.Ct. at 858. In that action the judgment was a default judgment of a United States District Court in the amount of $270,000 in an action for conversion by means of false representations. As in this instance, a motion to set aside the judgment on the stipulated issue of the value of the property was made. Effectively, the motion was denied, and the value of the coveted property was confirmed. A little more than two months later the Trustee in bankruptcy was authorized to seek to avoid the judgment. The Trustee moved to vacate the judgment asserting lack of proper service of process and fraud upon the court. The motion was denied and the denial was affirmed by the Court of Appeals.

In *Heiser v. Woodruff,* the court of appeals had adopted much the same point of view as did the bankruptcy court in this matter. It held that the bankrupt's trustee had failed to contend or prove fraud in procurement of the judgment, particularly proof that evidence of the value of the property was perjured. It held that the bankruptcy court was not bound concerning issues not "pressed."

The Supreme Court recognized that a bankruptcy court is not bound with respect to the rejection or allowance of claims— "not without appropriate regard for rights acquired under state law"—since federal law applies. The Court stated:

> But we are aware of no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata,* which is founded upon the generally recognized public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court. *Baldwin v. Traveling Men's Assn., 283 U.S. 522, 525–6* [51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931)].

*Heiser v. Woodruff,* 327 U.S. at 733, 66 S.Ct. at 856.

It held that since the claim of fraud had been "litigated and decided before the bankruptcy and has since been litigated between the petitioner and the trustee in bankruptcy, who represents the bankrupt and his creditors, that issue is now *res judicata* and may not further be litigated in the bankruptcy proceeding." *Id.* at 734, 66 S.Ct. at 857.

The Bankruptcy Court took a narrow view of this holding limiting the principles expressed to only those instances in which the Trustee itself litigates. It further compounded the matter by determining whether the Trustee's "course (sic) of action is identical to that of the Giorgios (bankrupts)." *Boyajian v. DeFusco (In re Giorgio),* 62 B.R. at 862. It held that "Because there is no similarity or unity of interest between the Trustee and the debtors, the doctrine of *res judicata* is not a bar to the Trustee's present action." *Id.* at 863.

A bankruptcy court may not reexamine issues determined appropriately in another tribunal. *Heiser v. Woodruff,* 327 U.S. at 736, 66 S.Ct. at 857–58. The claim may not now be relitigated.

■ The Bankruptcy Court's determination that the Rhode Island RICO statute (R.I.Gen. Laws §§ 7–15–1—7–15–11) was violated raises a host of, as yet, unresolved issues. Section 7–15–2, R.I.Gen. Laws includes as prohibited activities:

> (c) It shall be unlawful for any person employed by or associated with any en-

terprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt.

R.I.Gen. Laws § 7-15-2(c) (1979).

There is the initial and fundamental question of whether this statute can or should either constitutionally or as a matter of state law apply to a debt determined by a consent judgment to be due entered two years before the statute was enacted. Is a decedent's estate an "enterprise" under state law? *See, Gunther v. Dinger,* 547 F.Supp. 25, 27 (S.D.N.Y.1982). Is a claim filed in a bankruptcy court conduct which is "collection of an unlawful debt"? Since the statute limits recovery to a person "injured in his business or property by reason of a violation," R.I.Gen. Laws § 7-15-4(c) (1985), can the bankrupt debtors or their estate establish that the mere filing of a claim has caused them damage? There are no present clear state court responses to these and many other profound issues.

This Court is not required to speculate concerning the appropriate response to these questions. Section 7-15-1(d) defines an "unlawful debt" as one "incurred or contracted in an illegal gambling activity or business which is unenforceable in whole or in part as to principal or interest because of the law relating to usury." R.I. Gen. Laws § 7-15-1(d) (1979).

The statute literally construed could mean that the debt must be incurred in the pursuit of an "illegal gambling activity or business," a factor which is lacking in these circumstances since the loan was not made to satisfy a gambling debt due the lender. It is not necessary to go so far, however, because there can be no doubt of the validity of the debt, attacked as usurious, based upon the Rhode Island Supreme Court opinion in *DeFusco v. Giorgio,* 440 A.2d at 727. In no sense can a debt determined by a state court in a non-collusive action between the debtors and the creditor's decedent, considering and concluding the validity of the waiver of a claim of usury, be held to be "unenforceable." What is unenforceable under the Rhode

Island statute is a matter of state law. *United States v. Salinas,* 564 F.2d 688, 690 (5th Cir.1977), *cert. denied Davis v. U.S.,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978). This very issue was determined by the Rhode Island state superior and supreme courts.

Whatever may be the limitation of the doctrine of *res judicata* in the bankruptcy context, there is simply no authority for the reversal of a state court judgment, in the absence of fraud, collusion, or other infirmity in the state court judgment. None is suggested here, nor is any infirmity apparent. There is simply no basis for the determination that the debt sought to be collected was "an unlawful debt." In fact, spirit, purpose and effect it was determined to be a lawful debt six years before the solace of bankruptcy was sought by Mr. and Mrs. Giorgio. There was no violation of the Rhode Island RICO statute.

■ The issue of equitable subordination remains. The Bankruptcy Court ordered that the claim of Appellants be subordinated to the claims of general creditors, thereby *de facto* denying the claim. It did so because of its finding that the claim was based upon a usurious debt.

But, the Bankruptcy Court overlooked some vital circumstances. The creditor Pasco DeFusco did not testify. He had died two years before the contentions were made in the Bankruptcy Court. The result was that the Bankruptcy Court could hear only the testimony of the debtors in a matter which the Rhode Island Supreme Court had described in these terms: "The Giorgios concede that the note in question is not usurious on its face. Indeed, the facts surrounding its execution, which facts might support their claim of usury, are hotly disputed by the parties." *Giorgio v. DeFusco,* 440 A.2d at 732. It is true that responses of the decedent to interrogatories in the state court action were considered but these are hardly the equivalent of live witness testimony. A consideration of the vague, and sometimes inconsistent testimony of the bankrupts in this matter and a consideration of their obvious bias seriously suggests that more than a "hot

contest" is a reality and not a speculative possibility. A reading of the testimony of the bankrupts leaves one with the impression that they have been less than frank although they were able to convince the bankruptcy judge either to find in their favor or to recommend such a finding. This Court would not adopt such a recommendation based upon so slim and inconclusive a record.

If there is any inequity in these circumstances, it is the inability of the creditor, who has been dead for two years to respond to the repetition of the belatedly asserted claims of the bankrupts.

Furthermore, the equitable adjustment proposed by the Bankruptcy Court is supported only by a determination that the underlying loan was usurious, a determination which overlooks the state court's consideration of and determination that this issue was properly waived by the bankrupts.

Should the death of one of the parties not be sufficient to establish inequity, there is the further fact that during the creditor's lifetime the debtors raised the issue of usury, conceded its invalidity, sought to avoid the effect of their concession, and lost their effort to resist in the Rhode Island Supreme Court.

The simple fact is that the bankrupts have been given more than "one bite of the apple" by the Bankruptcy Court of fraud or malefaction in the underlying state court determination. Since equity follows the law, *Knight v. Town of Gloucester*, 831 F.2d 30, 32 (1st Cir.1987), it is inequitable to subordinate the claim of the Estate of Pasco DeFusco, deceased

The Bankruptcy Court held that "three conditions must exist before a claim is properly subordinated:

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Boyajian*

*v. DeFusco (In re Giorgio )*, 62 B.R. at 866. *See Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977).

The Bankruptcy Court found that the executors' claim was based on the loan-sharking activities "which Pasco DeFusco and his counsel attempted to disguise as a lawful promissory note." *Boyajian v. DeFusco (In re Giorgio )*, 62 B.R. at 867. There is no evidence that Mr. DeFusco's counsel participated in the alleged usury. The court found that the decedent's conduct constitutes a level of "moral turpitude sufficient to satisfy the standard required for equitable subordination." *Boyajian v. DeFusco (In re Giorgio )*, 62 B.R. at 867. There is simply no proper evidence to support this conclusion.

The third condition is satisfied since equitable subordination of the claim as it has been described and characterized by the Bankruptcy Court is appropriate. A usurious loan confers not only an unfair but also an illegal benefit upon a claimant. And, the executors stand no better off than their decedent who according to the court has engaged in this illegal conduct. The foundation upon which this reasoning rests is that the claim made by the executors was upon a usurious note. However, the Rhode Island Supreme Court had already determined that the note was a valid obligation concerning which, even if usurious, the debtors could and did waive their defense.

There is evidence that the claimants' decedent had engaged in inequitable conduct because the Bankruptcy Court took evidence on the issue in the first place. In effect this was an *ex parte* presentation since a denial could come only from the grave. Further, the parties had properly resolved the issue otherwise years before. Subordination of the claim under these circumstances is inequitable, and should not have been allowed.

The appeal is sustained and the action is remanded to the Bankruptcy Court for disposition in accord with this opinion.