## In re BAKER & GETTY FINANCIAL SERVICES, INC., et al., Debtors.

**FIRST NATIONAL BANK OF BARNES-VILLE, Plaintiff–Appellant (91–3200), Plaintiff/Cross–Appellant (91–3199),**

v.

**Carl D. RAFOTH, Trustee for Baker & Getty Financial Services, Inc., Baker & Getty Diversified, Inc., Baker & Getty Securities, Inc., Philip Cordek and Suzan Bierman Cordek, Defendants–Appellants (91–3195), Defendants/Cross–Appellants (91–3269).**

Nos. 91–3195, 91–3199, 91–3200 and 91–3269.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1992.

Decided Sept. 2, 1992.

---

· Daniel R. Swetnam (argued and briefed), Stephanie M. Vesper, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, D. Keith Roland, Carl D. Rafoth, Friedman & Rummel Company, Youngstown, Ohio, for plaintiff-appellee cross-appellant.

Robert M. Morrow, Columbus, Ohio (argued and briefed), for defendant-appellant cross-appellee.

Before: KENNEDY and BOGGS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

BOGGS, Circuit Judge.

This is a consolidated appeal arising out of an initial bankruptcy case brought by individual creditors against a stock brokerage and financial services firm. The Trustee seeks: a) to recover certain payments received by the First National Bank of Barnesville ("Bank") from the bankrupts; and b) to subordinate the Bank's claim against the bankrupt estates. The district court held that the Trustee could recover the payments made to the bank, but refused to subordinate the Bank's claims to those of other general creditors of the estate. We affirm.

I

Baker & Getty Financial Services, Inc. ("B & G"), a stock brokerage and financial services firm, was formed in August 1985 by Philip Cordek and Steven Medved.[1] Throughout 1985 and 1986, customers were solicited and the organization grew. In November 1986, it was revealed that Cordek had never purchased securities as ordered by customers and that B & G was engaged in a "Ponzi game," an investment scheme where investors are promised excessive returns on investments and where, typically, initial investors are paid the promised returns to attract additional investors. By November 1986, various investors dealing with B & G had been defrauded of approximately $2.5 to $3 million.

In August 1986, prior to disclosure of the scheme, Cordek and one of B & G's original customers, Byron Rice, decided to invest $1,000,000 in the bond market, purchasing certain bonds on margin. Rice was to obtain the funds and Cordek was to oversee their investment. In early August 1986, Rice, a long-time customer of First National Bank of Barnesville, approached its president, Charles J. Bradfield, about a $1 million loan for the bond purchase.

The Bank initially approved the loan, the largest personal loan in the Bank's history, on August 12, 1986, solely as a loan to Rice and his wife. At this point, Cordek's name was never mentioned to the Bank. However, prior to the closing, Rice asked Cordek to sign his name to the loan note. On August 27, 1986, a loan of $1.1 million was granted by the Bank to Rice and Cordek.[2]

The Bank failed to secure the loan properly. It had requested that collateral of approximately $200,000 be provided at the closing but only perfected its interest in this collateral to the extent of approximately $55,000.[3] The promissory note was exe-

---

1. In December 1985, Baker & Getty Diversified was formed to locate and develop real estate investments for customers of B & G Financial Services. In late May of 1986, Baker & Getty Securities was formed to take the place of B & G Financial Services and B & G Diversified.

2. The loan was increased to $1.1 million after the Bank's president, Bradfield, decided that he would like to participate in the bond transaction. Bradfield entered into a separate transaction with Rice on the night of the closing, and agreed to have the Bank loan a total of $1.1

million so that Bradfield could participate in the transaction to the extent of the additional $100,000. However, Bradfield was not a party to the $1.1 million note.

3. The Bank did not attempt to secure the loan fully and its attempts at partial security also failed. From Cordek, the Bank accepted a mortgage on his Shaker Heights residence, the titles to two of his vehicles and a financial statement that included assets that he later admitted he did not own. However, the Bank prepared an invalid mortgage, as it did not

cuted on August 27, 1986 and was due September 11, 1986. However, Cordek informed the Bank throughout the fall of 1986 that the bonds purchased with the loan had not yet been sold, although he later testified that the bonds had been sold at a loss soon after the loan was made and that he had the proceeds deposited in his own personal account. It appears that the Bank's reliance on Cordek's assertions caused its delay in attempting to perfect its security interest. It was not until October 24, 1986 that the Bank received its first payment on the note by taking $30,000 from a B & G account held by the Bank. The Bank took another $15,800 from the account on November 8, 1986. Finally, on November 15, 1986, the Bank received $200,000 that originated from the sale of an airplane owned by a B & G affiliate, making a total of $245,800 the Bank had received from B & G.

In the spring of 1987, Bradfield attempted to have a bond trading house, which held Cordek's personal account to which the proceeds of the bond sale had been transferred, pay the balance of the note. To do this, Bradfield signed a sworn statement, which he conceded was patently false, that the bonds purchased by the loan were to have been pledged as collateral for the loan. The lower courts concluded that this false statement was made in an effort to have the bond trading house accept responsibility on the loan.[4]

The Bank also sought payment from Rice. In early 1987, Rice paid the Bank $12,378. In September 1987, the Bank entered into a settlement agreement with the Rices, requiring them to pay $145,000 immediately and $80,000 over the next twelve years. The Rices were released from all other liability against the note. Thus, the Bank received less than 25% of the total amount of the note from the Rices.

Meanwhile, on January 22, 1987, three defrauded individuals filed involuntary bankruptcy petitions against B & G. The petitions were not contested and Carl D. Rafoth was appointed trustee on February 18, 1987. On April 28, 1987, Cordek, who was a principal in all the B & G organizations, and his wife were joined as affiliates. On September 8, 1987, upon the motion of petitioning creditors, the bankruptcy court substantively consolidated the estates of B & G with those of Philip and Suzan Cordek, who had earlier been joined as affiliates, but who at that time were not debtors in the case. *Matter of Baker & Getty Fin. Serv., Inc.*, 78 B.R. 139 (Bankr.N.D.Ohio 1987). The Bank, which was a creditor of Philip Cordek individually but not a creditor of B & G, opposed this motion.

The first appeal before us, No. 91–3200, arises because the Trustee filed a complaint for turnover against the Bank on September 1, 1987, alleging that the Bank had received three preferential and fraudulent transfers from B & G totalling $245,800. On March 15, 1989, the bankruptcy court granted summary judgment for the Trustee, holding that all three of the payments that the Bank had gotten from B & G in the fall of 1986 were recoverable by the Trustee both as preferential transfers and as fraudulent transfers, 98 B.R. 300. The Bank appealed to the district court, which affirmed the bankruptcy court's decision in favor of the Trustee regarding preferential transfers on January 14, 1991. The Bank appeals that decision. The Trustee cross-appeals, in No. 91–3269, the district court's failure to review and affirm the bankruptcy court's finding that the Bank did not receive the transfers in good faith.

The second appeal, No. 91–3195, arises from the Bank's filing a proof of claim in

---

conduct a title search on the house and failed to discover that the home was owned by Suzan Cordek, not Philip Cordek. The Bank perfected some of its interests in the Cordek collateral, but subsequently was forced to release the interests under the preferential transfer section of the Bankruptcy Code, 11 U.S.C. § 547. Rice presented the Bank with sight drafts on various bank accounts he owned, approximately $25,000

in jewelry and cash, and titles to vehicles from his automobile business. This resulted in only $55,000 in perfected security interest.

4. Furthermore, when the Bank finally recognized that the mortgage to the Cordek home was defective, it prepared a new one on February 4, 1987. However, the new mortgage was never signed or filed.

the consolidated bankruptcy proceedings for $659,197.53, the principal amount still due on the $1.1 million promissory note issued to Cordek and Rice. The Trustee objected to this claim, arguing that Cordek was only an accommodation party to the promissory note, and thus not liable on it, and that the Bank had unjustifiably impaired the collateral securing the loan. In the alternative, the Trustee sought to have the Bank's claim subordinated to the claims of unsecured creditors, pursuant to 11 U.S.C. § 510(c). In March 1990, the Trustee reported that he had $1,369,930.92 on hand and that the claims of creditors other than the Bank totalled $2,398,523.70. Thus, if the Bank's claim is excluded, unsecured creditors may realize a distribution of 57% of their claims; if the Bank's claim is included, the unsecured creditors' distribution will be reduced to 44% of their claims.

On June 23, 1988, the bankruptcy court held that Cordek was an accommodation maker on the note, but should not thereby be relieved of liability on the note. However, the court also held that, while the Bank's claim should not be disallowed, it should be equitably subordinated to the claims of general unsecured creditors. The Bank appealed to federal district court. On January 10, 1991, the district court affirmed the finding that Cordek was an accommodation maker, but also held that the Trustee had failed to meet its burden of justifying subordinating the Bank's claim. The district court therefore reversed the bankruptcy court's decision subordinating the Bank's claim; the Trustee appeals to this court. The Bank cross-appeals, in No. 91–3199, the finding that Cordek was only an accommodation maker to the note.

## II

We first address the issue of the Bank's claim in the consolidated bankruptcy proceedings for the principal amount still due on its promissory note signed by Cordek and Rice, and affirm the district court's conclusion that the Bank's claims should not be subordinated to the claims of general unsecured creditors.

■ The bankruptcy court, in holding that the Bank's claim should be subordinated, relied heavily on its determination that Cordek was only an accommodation maker to the original note. In contrast to a principal maker of a note, an accommodation maker is one who signs the instrument in any capacity for the purpose of lending his name to another party to it. Ohio Rev. Code § 1303.51(A). The bankruptcy court found that

> Cordek was an accommodation maker on the note. At the time the loan was made, the Bank relied upon the security of Rice and the ability of Rice to pay the full amount of the loan, and the Bank's obligation was fully secured by Rice's collateral at that point.

■ Accommodation status is a question of fact. Ohio Rev.Code § 1303.51(C); *Fidelity Title Serv. v. Ball Homes, Inc.*, 25 Ohio App.3d 52, 54, 495 N.E.2d 964 (1985). Findings of fact entered by the bankruptcy court will not be set aside unless clearly erroneous. *See* Bankruptcy Rule 8013. A bankruptcy court's findings of fact are not to be disturbed unless there is "most cogent evidence of mistake or miscarriage of justice." *In re Edward M. Johnson and Assoc., Inc.*, 845 F.2d 1395, 1401 (6th Cir. 1988) (citations omitted). In addition, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013.

■ In determining whether a party has signed a note in an accommodation or principal maker status, the courts have considered four factors: the location of the signature on the note, the language of the note, whether the maker received any loan proceeds, and the intent of the parties. *In re Feitlinger*, 82 B.R. 860, 862 (Bankr. S.D.Ohio 1987).

The district court held that the bankruptcy court's determination that Cordek was an accommodation maker was not clearly erroneous. We disagree with this holding. We note especially the location of Cordek's signature, below Rice's and above the line which read "Borrower's Signature," and

the language of the agreement. On the back of the agreement there is a specific place for a co-maker to sign as an accommodation party, which was not used. The district court had found these facts insufficient to dictate a decision for the bank, stating that the placement of the signature could support either inference, that there was no evidence that either party was aware of this section on the back of the note, and, as the Trustee points out, that Cordek's name was spelled incorrectly. However, the third factor, whether the maker received any loan proceeds, clearly works in the Bank's favor, as Cordek benefited by placing the proceeds of the bond sale in his own personal account. Cordek also was to receive one-half of the profits from the bond purchase.

As for the fourth factor, the intent of the parties, the district court found that factor to favor the Trustee. The district court noted that the record "indicates that while some of Cordek's testimony does support the inference that he may have understood he was to be principally liable, there is an equal, if not greater, amount of testimony which indicates the opposite." It concluded that "[t]he question as to Cordek's status is a close one, but it was entirely within the sound discretion of the bankruptcy court as finder of fact to conclude as it did. A finding that Cordek was an accommodation maker is not clearly erroneous, just as a finding that Cordek was primarily liable would not have been clearly erroneous."

We disagree; the intent of the parties also weighs in favor of a finding that Cordek was a principal maker. The evidence indicates that at the time of the signing of the loan (as opposed to the time at which the loan was approved), the intent of all the parties was that both Rice and Cordek would sign the note as principal makers. The location of the signatures points strongly to this conclusion as well.

We thus reach the same ultimate conclusion as the bankruptcy court and the district court: Cordek is liable because of his signature on the $1.1 million loan granted by the bank. However, we hold that the application of the four factors described

above requires the conclusion that Cordek was a principal maker of the note as opposed to an accommodation maker, based on the location of his signature, the lack of any language of limitation, the language of the note stating that he was to receive the proceeds along with Rice, and the fact that he pledged collateral for the loan. The intention of the parties to make Cordek a principal maker is further shown by the fact that after the loan was used to purchase bonds and the bonds were sold, the proceeds of the sale were deposited in Cordek's account. Based on all of these facts, the view of the courts below was clearly erroneous, though we affirm their ultimate conclusion that Cordek is liable on the note.

### III

The appropriate standard of review of the bankruptcy court's conclusions of law is *de novo*. *See In re Edward M. Johnson and Assoc., Inc.*, 845 F.2d at 1398. When reviewing decisions of a district court that review a bankruptcy court, this court reviews the district court's decision *de novo*. *See Matter of Virtual Network Serv. Corp.*, 902 F.2d 1246, 1247 (7th Cir. 1990).

The bankruptcy court found that the Bank engaged in inequitable conduct to the injury of other creditors and thus subordinated the Bank's claim, pursuant to 11 U.S.C. § 510(c), which provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

The legal standard for establishing equitable subordination was set forth in *Matter of Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977). Most courts have uniformly followed and applied the *Mobile Steel* test, requiring the following three conditions to be shown by a preponderance

of the evidence to justify equitable subordination:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Matter of Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977). *See In re Mace Elec. of Ohio, Inc.*, 92 B.R. 753, 755 (Bankr.N.D.Ohio 1988); *In re Medical Equities, Inc.*, 83 B.R. 954, 961–62 (Bankr. S.D.Ohio 1987).

The legal standard in applying this test varies depending on whether the creditor is an insider or a non-insider. It is undisputed that the Bank is a non-insider.

The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of the misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny.

*Matter of Teltronics Serv., Inc.*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) (citations omitted).

For the Bank, as a non-insider, to be found in violation of the first part of the *Mobile Steel* test, the preponderance of the evidence must show that the Bank was guilty of "gross misconduct tantamount to fraud, overreaching or spoliation...." *Ibid.* The Trustee argues that the Bank's conduct was egregious and points to the following facts: the Bank lent money to the Rices and Cordek's name was added as an afterthought at Rice's request; Cordek's assets or resources had no impact on the Bank's decision to lend money to the Rices; the Bank failed to perfect its security interests in the Rices' assets, which would have fully protected the Bank; the Bank engaged in deception by taking money from improper accounts, seizing proceeds from the sale of an asset owned by an entity not connected with the loan, and submitting perjured statements to third parties in an attempt to have them cover for the Bank; finally, the Trustee notes that the Bank settled with the Rices for only 25% of the total loan.

The Bank counters that as of the date of the loan, both Rice and Cordek had agreed to be principal makers and that the Bank was looking to Cordek to repay the loan obligations from the proceeds of the sale of the bond transaction. The Bank admits that it may have been ill-advised in not perfecting its security interests, but contends that there was no indication that it acted fraudulently.

The district court agreed with the Bank, and reversed the bankruptcy court's finding of equitable subordination on the grounds that it was clearly erroneous. The district court held that even though the Bank's practices with regard to this $1.1 million note were lax, imprudent, and ill-advised, the conduct was not gross or egregious in relation to the bankruptcy estate. A similar conclusion was reached in *In re Tinsley and Groom*, 49 B.R. 85 (Bankr. W.D.Ky.1984), where the imprudent actions of a bank president who entered into a series of unsecured loans with a bankrupt debtor were, in and of themselves, insufficient to justify equitable subordination. The *Tinsley* court held:

Giving the greatest weight to the most damaging testimony against the defendant's lending practices establishes only a lending policy which was liberal in approving renewal applications, accepting at face value debtors' projections, relying heavily on the character and ability of the debtors, and financing the debtors' over-zealous goals. Such policy, while perhaps not a sound or prudent lending

practice, falls short of imposing culpability for the results which debtors' actions eventually occasioned.

*Id.* at 91.

We agree with this distinction. While the Bank might clearly have been guilty of "gross misconduct" toward its shareholders, the same cannot be said of its conduct in relation to the B & G estates, where the Bank's conduct occurred before bankruptcy proceedings began and was not specifically directed toward the injury of the debtor or other creditors or for gaining an unfair advantage over other creditors. *See In re Giorgio,* 62 B.R. 853 (Bankr.D.R.I.1986), *remanded,* 81 B.R. 766 (D.R.I.1988), *aff'd,* 862 F.2d 933 (1st Cir.1988); *In re Osborne,* 42 B.R. 988 (W.D.Wis.1984); *In re Scallywags, Inc.,* 84 B.R. 303 (Bankr.D.Mass. 1988); and *In re Sepco,* 36 B.R. 279 (Bankr. D.S.D.1984). Thus, we conclude that the Bank's actions do not meet the first part of the *Mobile Steel* test, and therefore it should not be equitably subordinated to other creditors.

■ While we hold that the Bank's claim should not be subordinated on equitable grounds under the *Mobile Steel* test, the Trustee argues on appeal that a finding of inequitable conduct is no longer required as a prerequisite for equitable subordination. The Trustee argues that the *Mobile Steel* requirement of "gross misconduct" has been modified by the Seventh Circuit's holdings in *Matter of Vitreous Steel Prod. Co.,* 911 F.2d 1223 (7th Cir.1990), and *Matter of Virtual Network Serv. Corp.,* 902 F.2d 1246 (7th Cir.1990). Under these cases, the Trustee maintains that the new test is a standard of overall fairness to be applied on a case-by-case basis, which would allow equitable subordination even in circumstances where no "gross misconduct" has occurred.

The Trustee is correct that the Seventh Circuit in *Virtual Network,* after examining the legislative history of § 510(c), concluded that "equitable subordination no longer requires, in all circumstances, some inequitable conduct on the part of the creditor." 902 F.2d at 1250. Applying a fairness standard, the *Virtual Network* court

upheld equitable subordination of IRS tax penalty claims to those of other unsecured creditors on the grounds that punitive, nonpecuniary, claims of the IRS should be subordinated to actual loss claims.

However, as noted in *Diasonics, Inc. v. Ingalls,* 121 B.R. 626 (Bankr.N.D.Fla.1990), the *Virtual Network* court focused on the nature of the claim as a penalty, in determining whether it should be subordinated to other claims that were not punitive. Numerous courts have similarly subordinated claims for punitive damages without making a finding of inequitable conduct. *Id.* at 628–29. The *Diasonics* court refused to extend the *Virtual Network* reasoning to cases not involving punitive damages. *Id.* at 629. We similarly see no cause to expand a "fairness standard" involving punitive damages to a case such as this one, which involves actual loss claims by all parties. Thus, we decline to follow *Virtual Network,* and hold that the Bank's claim should not be equitably subordinated.

### IV

■ The bankruptcy court granted summary judgment to the Trustee, pursuant to 11 U.S.C. § 547, to recover as preferential transfers three payments to the bank totalling $245,800. The district court affirmed.

According to 11 U.S.C. § 547, a trustee may avoid a transfer that was made to a debtor on or within ninety days before the date of the filing of the petition for bankruptcy.

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

1) to or for the benefit of a creditor;

2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

3) made while the debtor was insolvent;

4) made—

A) on or within 90 days before the date of the filing of the petition; or

B) between ninety days and one year before the date of the filing of the peti-

tion if such creditor at the time of such transfer was an insider;  and

5) that enables such creditor to receive more than such creditor would receive if—

A) the case were a case under chapter 7 of this title;

B) the transfer had not been made;  and

C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)

The parties do not dispute that all three transfers—$30,000 on October 24, 1986; $15,800 on November 8, 1986;  and $200,000 on November 15, 1986—were made within ninety days of the filing of the involuntary petitions on January 22, 1987.  However, the Bank argues that 11 U.S.C. § 547 should not apply because the operative date for computing the 90–day preference period should be September 8, 1987, the date the Cordeks' estates were substantively consolidated with the B & G estates.

In holding that the transfers occurred within the 90–day period, both the bankruptcy and district courts relied on *Matter of Evans Temple Church of God in Christ & Community Ctr., Inc.*, 55 B.R. 976 (Bankr.N.D.Ohio 1986), in which an individual debtor filed a bankruptcy petition in February 1984, and several months later the petition was amended to add a church as debtor.  The cases were consolidated in July 1984 and the bankruptcy court held that the church could avail itself of the individual's February filing date for purposes of calculating the 90–day preference period.

> Substantive consolidation is employed in cases where the interrelationships of the debtors are hopelessly obscured and the time and expense necessary to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all of the creditors.  In any consolidated case, there is implicit in the Court's decision to consolidate the conclusion that the practical necessity of consolidation to protect the possible realization of any recovery for the majority

of the unsecured creditors far outweighs the prospective harm to any particular creditor.

> Thus, when a case is substantively consolidated, the Order for consolidation is, in effect, a determination by the Court that consolidation is warranted by the circumstances of the cases and that it is in the best interest of unsecured creditors to join the assets and liabilities of two debtors.  It is, in effect, a statement by the Court that the assets and liabilities of one debtor are substantially the same assets and liabilities of the second debtor....

> ....

> ... [I]t logically follows that where two cases are substantively consolidated ... the preference provisions require us to treat the creditors of both debtors in substantially the same manner.  In order for us to do so, we must assign a like filing date to both Debtors for purposes of the preference provisions.

*Evans Temple*, 55 B.R. at 981–82 (citations omitted).

The facts in this case meet all the standards articulated in *Evans Temple*, which emphasized that an order of consolidation is itself a statement that the two debtors are "hopelessly intertwined" and that their respective assets and liabilities should be pooled.  Beyond the actual fact of consolidation, the *Evans Temple* decision also focused on whether creditors consider the two debtors to be one.  In this case, as the district court pointed out, evidence exists that the Bank did treat the debtors as one entity, as funds were taken from B & G accounts to satisfy Cordek's debt.  We agree with the district court that the Bank did not meet its burden of proving that the debtors were not treated as one.

■ On appeal, the Bank, relying almost exclusively on *In re Auto–Train Corp., Inc.*, 810 F.2d 270 (D.C.Cir.1987), argues that neither the district court nor the bankruptcy court gave proper consideration to the extreme prejudice that the preference date order has caused the Bank.  In *Auto–Train*, the bankruptcy court substantively consolidated a wholly-owned subsidiary of

a debtor in a pending bankruptcy case. Prior to the substantive consolidation, the subsidiary was not a debtor. The trustee used the retroactive filing date of the parent corporation to attack a transfer made by the subsidiary to one of its creditors. The District of Columbia Circuit reversed, holding that before ordering a consolidation *nunc pro tunc*, the bankruptcy court must use a balancing test to ensure that the relation back of a *nunc pro tunc* consolidation order yields benefits offsetting the harm it inflicts. *Auto–Train*, 810 F.2d at 277. Under this balancing test, the

> inquiry will closely parallel that conducted with respect to consolidation. Because the consolidation proceeding will already have established a substantial identity between the entities to be consolidated, this inquiry begins with the proponent of *nunc pro tunc* making a showing that *nunc pro tunc* is necessary to achieve some benefit or avoid some harm. Following this showing, a potential preference holder may challenge the *nunc pro tunc* entry of the consolidation order by establishing that it relied on the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates. If a potential preference holder meets this burden, the court must then determine whether the benefits of *nunc pro tunc* outweigh its detriments.

*Auto–Train*, 810 F.2d at 277 (footnote omitted).

We decline to adopt the analysis of *Auto–Train*, without conceding that the use of that rule would make any difference in the ultimate outcome in this case. We believe that the *Evans Temple* rule is sounder, and makes for more certain administration of the Bankruptcy Code. As *Auto–Train* itself noted, the inquiry it proposed will "closely parallel" the inquiry already conducted in ordering consolidation. It would add needless confusion to allow relitigation of this question in the guise of litigation over the filing date, par-

ticularly when the outcomes will almost always be the same. The order of consolidation rests on the foundation that the assets of all of the consolidated parties are substantially the same. Therefore, the earliest filing date is the controlling date, and all transfers are to be analyzed as of that date.

## V

Finally, we must decide if there is a genuine issue of material fact as to whether the Bank may use the immunity defenses of 11 U.S.C. § 550 and 11 U.S.C. § 548(c) in order to defeat the Trustee's claim to the $200,000 payment from Rice to the Bank on November 15, 1986.[5] The bankruptcy court held that the payment to the Bank was fraudulent and preferential and could therefore be recovered by the Trustee. The district court affirmed this finding, although it did not review the bankruptcy court's finding that the Bank did not receive the transfers in good faith.

The Bank argues that it should retain the $200,000 payment based on two immunity provisions in 11 U.S.C. § 550 and 11 U.S.C. § 548(c). Section 550 provides:

a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

2) any immediate or mediate transferee of such initial transferee.

b) The trustee may not recover under section (a)(2) of this section from—

1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith,

---

5. On appeal, the Bank concedes that the other two payments secured from B & G bank accounts, totalling $45,800, were recoverable if the 90–day preference period began on January 22,

1987. Because of our ruling on the preference period, therefore, we hold that these two payments were recoverable.

and without knowledge of the voidability of the transfer avoided; or

2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. An initial transferee is one who receives money from a person or entity later in bankruptcy, and has dominion over the funds. A mediate or immediate transferee is simply one who takes in a later transfer down the chain of title or possession.

Under § 550(b), a mediate or immediate transferee receives protection if it has taken for value in good faith without knowledge of the voidability of the transfer. However, an initial transferee receives no such protection. Both of the lower courts held that the Bank was an initial transferee under § 550(a) and was therefore not entitled to assert affirmative defenses under § 550(b). The Bank contends that there is a genuine issue of material fact as to its transferee status and therefore that summary judgment was improper.

The Bank sets forth various evidence that the $200,000 payment appeared to be Rice's money, not B & G's, and thus that it was not an initial transferee. Relying on *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir.1988), it argues that the dispositive issue in making such a determination is whether the party can exercise dominion or control over the funds. In *Bonded*, the defendant bank received a check for $200,000 from a debtor, payable to the bank's order, with instructions to deposit the check in the debtor's account. The debtor then instructed the bank to debit his account in the amount of the check on January 31. The court held that the bank was not an initial transferee, even though the check was made payable to it, because it had no dominion over the money. *Bonded*, 838 F.2d at 894. The *Bonded* court also held that

[t]he minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.

*Id.* at 893.

The Bank argues that *Bonded* establishes a "dominion" test as opposed to a "pur-

pose" test. Thus, the Bank argues that no matter what the parties' ultimate intent was for the ultimate use of the money, the Bank never had dominion over the funds, as Rice still had control over them while they were in his bank account for two weeks, and therefore it was not an initial transferee.

We disagree and hold that the Bank was an initial transferee. We conclude that the $200,000 cashier's check for the airplane belonged to B & G and therefore that the Bank was an initial transferee. B & G sold an airplane and received a $200,000 cashier's check that was made out to the buyer and then endorsed in blank. Cordek then told Rice to take the $200,000 check and apply it to the bank loan indebtedness. Rice was acting as an agent when he went to the Bank and tried to apply the check to the loan. However, the Bank told Rice to deposit the check into his account until it cleared. As soon as the check cleared, two weeks later, the money was then immediately given over to the Bank. The $200,000 was always Cordek's. It was never Rice's money. Therefore, the district court was correct in finding the Bank an initial transferee.

The fact that the money was temporarily lodged in Rice's account does not alter the facts above. It is true that as a matter of commercial law, Rice could have applied the endorsed cashier's check to any purpose he chose. However, in law the money was not his and he was simply acting at the direction of Cordek. The situation is no different than if Rice had been entrusted with $200,000 in cash to make a payment at the direction of Cordek and the bank had refused to take responsibility for the deposit of such a sum in cash until the next day. It would make no difference whether Rice then took the cash home, or placed it in a safe deposit box in the Bank: the money would still be Cordek's, and the Bank would still be an initial transferee of the money. This outcome would obtain even though as a matter of raw power, Rice could have violated his instructions and taken the cash to a race track or a jewelry store.

As for the Bank's argument that it qualified for immunity under 11 U.S.C. § 548(c) because it accepted the payments in good faith, we find that statute is inapplicable in this case. The statute provides that

[e]xcept to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

Section 548(c) explicitly provides that if the transfer is avoidable under § 544, § 545, or § 547, then the immunity afforded by § 548(c) is unavailable. Section 548(c) is available only to a creditor who has a transfer avoided under other sections. Here, as noted earlier, the transfer was avoided under § 547, and thus the issue of immunity under § 548(c) is moot.

We AFFIRM the district court, holding that the Bank's claims should not be subordinated. We also hold that the Trustee has a right to the $200,000 preferential payment, as the Bank was an initial transferee and therefore not entitled to keep the preferential payment under the good faith immunity defenses that are available to mediate transferees only.